## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MARIANNE SCOTIN0, o/b/o C.S.,          )
                                        )
    **Plaintiff,**                       )
                                        )
    **vs.**                             )          **Case number 4:12cv0674 TCM**
                                        )
**CAROLYN W. COLVIN, Acting**           )
**Commissioner of Social Security,**[1]  )
                                        )
    **Defendant.**                      )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying the application filed on behalf of C.S. (Plaintiff) by his mother, Mary Ann Scotino, for supplemental security income benefits (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a review and final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).

## Procedural History

Ms. Scotino applied for SSI on Plaintiff's behalf in August 2009, alleging Plaintiff was disabled since June 1, 2008,[2] when he was almost nine years old, due to attention deficit

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security in February 2013 and is hereby substituted for Michael J. Astrue as defendant.  See 42 U.S.C. § 405(g).

[2] An earlier claim was denied on May 30, 2008, following a hearing.

hyperactivity disorder (ADHD) and borderline intellectual functioning. (R.[3] at 100-102.) This application was denied initially and following an administrative hearing held in June 2010 before Administrative Law Judge (ALJ) F. Terrell Eckert, Jr.  (Id. at 7-11, 25-45, 48-52.)  After reviewing additional evidence submitted by Plaintiff, see pages 17 to 18, infra, the Appeals Council denied a request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-4.)

## Testimony Before the ALJ

Ms. Scotino, represented by counsel, testified at the administrative hearing.[4]

Plaintiff has been seeing Dr. Robinson for counseling.[5]  (Id. at 30.)  Dr. Robinson informed Ms. Scotino that counseling for ADHD does not help.  (Id.)  Because her 22-year old son has Asperger's, Ms. Scotino thought Plaintiff might also.  (Id. at 31.)  Dr. Robinson did not rule out Asperger's; rather, he said to see how Plaintiff develops.  (Id.)  Plaintiff is seeing his regular pediatrician, Dr. Sakmar, for his ADHD.  (Id.)

Asked what concerns her about Plaintiff's functioning, Ms. Scotino explained that he is a "follower."  (Id.)  He wants to act like whoever is in the room acts; wants to please; is impulsive; and never thinks before he does anything.  (Id. at 31-32.)  For instance, if he is

---

[3]References to "R." are to the administrative record electronically filed by the Commissioner with her answer.

[4]Plaintiff testified only briefly.  His testimony is not relevant.

[5]See note 9, supra.

playing tag, he'll jump off the porch over a bush.(Id.)  He will not look when crossing the street and has had cars honk at him.  (Id.)

He is able to handle eating utensils, although Ms. Scotino cuts his meat for him because of his problems with fine motor skills.  (Id. at 32-33.)  He has problems with writing and putting snapping toys together.  (Id. at 33.)  He is in occupational therapy at school.  (Id.)  He needs help with belts and tying his shoes, but not with buttons.  (Id. at 34.)  He can pick up coins.  (Id.)  He has no problem with gross motor skills.  (Id.)  He needs help bathing and with the toilet.  (Id. at 42.)  He will be eleven years old in November.  (Id.)  He does not like to change clothes.  (Id. at 43.)

Plaintiff has a hard time adjusting to a new routine at the start of a school year.  (Id. at 35.)  He has difficulties completing his homework.  (Id.)  It is harder as he gets older.  (Id. at 36.)  He is in third grade.  (Id.)

Also, Plaintiff has trouble paying attention.  (Id.)  His teachers report that he has trouble sitting still in class.  (Id.)  When she sees that he is getting to a point where he will get into trouble at school, she has him "take a day off."  (Id. at 37.)  She can tell when this is necessary because he starts not doing anything she asks.  (Id.)  After he stays at home for a day, he is okay at school the next day.  (Id.)  This happens approximately four times a year.  (Id. at 37-38, 40.)  Six or seven times a school year, he is reprimanded for something.  (Id. at 40.)  When this happens, she goes to the school and tries to intervene so he can complete the day.  (Id.)

Plaintiff has friends in the neighborhood.  (Id. at 38.)  If the other children are his age or close to it, he will tend to do what they tell him to do.  (Id. at 38-39.)  Ms. Scotino also testified that Plaintiff continues to wear a glove on his right hand although one of the older children she referred to stopped wearing a glove.  (Id. at 43.)

Two days a week, he goes to a Boy's Club for five hours.  (Id. at 39.)  Half-way through his day there, he will call her to come get him and will sit by the door and watch for her.  (Id.)

Ms. Scotino estimates that Plaintiff is one and one-half years behind others at school. (Id. at 41.)  She thinks he might be two and one-half years behind in math.  (Id. at 42.)  He was promoted to the next grade at the end of the school year.  (Id. at 41.)  He is not in an extended summer program.  (Id.)  She promises him the summer off so they can get through the school year.  (Id.)  His teachers have told her that a summer program is not mandatory. (Id. at 42.)

## Medical, School, and Other Records Before the ALJ

The records before the ALJ included reports Ms. Scotino completed as part of the application process, school records, and medical records.

When applying for SSI for Plaintiff, Ms. Scotino completed a Disability Report.  (Id. at 128-35.)  Plaintiff was then 4 feet 11 inches tall and weighed 62 pounds.  (Id. at 128.)  His disabling illnesses are allergies, ADHD, a learning disability, and disruptive behavior disorder.  (Id. at 129.)  He was in third grade, and was in special education and speech therapy.  (Id. at 133.)

On a Function Report form for children ages six to twelve, Ms. Scotino reported that Plaintiff does not have any problems seeing or hearing.  (Id. at 115-24.)  His ability to communicate is not limited.  (Id. at 117-18.)  His ability to progress in learning is limited in that he can not write longhand, spell most three to four letter words, write a simple story with six to seven sentences, add and subtract numbers over ten, make correct change, or tell time. (Id. at 119.)  His physical abilities are not limited.  (Id. at 120.)  His impairments affect his behavior with other people in that he does not have friends his own age, cannot make new friends, and does not play team sports.  (Id. at 121.)  He sometimes has difficulties getting along with his mother and other adults.  (Id.)  His impairments also affect his ability to help himself and cooperate with others in taking care of his personal needs.  (Id. at 122.) Specifically, he does not button his clothes by himself, tie his shoes, take a bath, brush his teeth, comb or brush or wash his hair, choose his own clothes, hang up his clothes, obey safety rules, or accept criticism or correction.  (Id.)  His ability to pay attention and stay on tasks is limited, i.e., he does not work on arts and crafts projects or complete his homework. (Id. at 123.)  He does complete his chores most of the time, keep busy on his own, and finish what he starts.  (Id.)

Ms. Scotino completed a Disability Report – Appeal form after the initial denial of Plaintiff's SSI application.  (Id. at 213-17.)  There were no new concerns or illnesses and no changes in Plaintiff's limitations since the initial report had been completed.  (Id. at 213.) Also since that time, he had not seen any doctors for any conditions at issue.  (Id. at 214.)

Plaintiff's school records before the ALJ begin with those of a May 2006 meeting of an evaluation team at the end of Plaintiff's kindergarten year at Shenandoah School, part of the St. Louis Public Schools system.  (Id. at 138-56.)  It was noted that Plaintiff had been having difficulty learning to write and with completing written work.  (Id. at 138.)  He appeared to have a fine motor problem and, possibly, visual perceptual and visual motor planning problems.  (Id.)  Ms. Scotino described Plaintiff as "easy-going, fun-loving, and considerate," but lacking in maturity.  (Id. at 139.)  She was concerned about his progress in reading and math skills and his ability to complete written work.  (Id.)  She reported that he gave up easily, sought attention, was passive, and disobeyed rules.  (Id.)  His developmental history was normal for such physical abilities as crawling and walking, but was delayed in speech.  (Id.)  He was exposed to lead when he was four years old.[6]  (Id.)  Screening tests showed no concerns with Plaintiff's "vision, hearing, speech/language, or social/emotional/behavior."  (Id.)  Plaintiff's kindergarten teacher estimated that he was functioning at kindergarten level in reading and mathematics and at preschool level in written expression.  (Id.)  He consistently followed directions, completed assigned tasks, completed and turned in homework, and contributed to discussion and activities.  (Id.)  He inconsistently worked independently.  (Id.)  He sometimes needed to be reminded to practice self-control.  (Id.)  His adaptive behavior was considered to be below average.  (Id. at 140.)  To help Plaintiff as the year progressed, accommodations were made of modified handwriting sheets; individual attention when writing, coloring, or cutting; and being allowed

---

[6]The Court notes that later tests showed Plaintiff's lead levels to be normal.  See id. at 28.

to dictate answers when he was unable to correctly form letters and numbers.  (Id. at 139, 140.)  His poor written language skills were assessed as having a negative impact on his academic development.  (Id. at 140.)

Before the team met, Plaintiff was given several tests.  His scores on the Wechsler Preschool and Primary Scale of Intelligence – Third Edition were in the low average range, i.e., a verbal intelligence quotient (IQ) of 86, a performance IQ of 82, a processing speed IQ of 78, and a full scale IQ of 81.  (Id. at 140, 152.)  It was thought that his processing speed IQ was lower than the other scores because of his poor motor skills and his deficits in visual processing.  (Id. at 140.)  Because of his poor motor skills, Plaintiff was also given the Comprehensive Test of Nonverbal Intelligence.  (Id.)  The results of this test included a nonverbal IQ of 91, a pictorial nonverbal IQ of 87, and a geometric nonverbal IQ of 91.  (Id. at 140, 152.)  His adaptive behavior as described by Ms. Scotino to the social worker and reported on the Vineland Adaptive Behavior Scale – Interview Edition placed him in the age equivalence of five years; Plaintiff was then six years six months old.  (Id. at 140-41, 152.)  Plaintiff's writing difficulties were also evident when Plaintiff was forming his letters and numbers.  (Id. at 141.)  His classroom work was below that of his grade peers in the areas of reading, mathematics, and written expression.  (Id.)  A comparison of his scores on two tests of academic achievement indicated that his achievements in the areas of reading and mathematics were commensurate with his cognitive abilities in reading and mathematics, but not in written expression.  (Id. at 141, 142, 152-53.)  It was concluded that "although [Plaintiff's] cognitive ability is within the normal range, his achievement significantly lags

- 7 -

behind his ability, thus jeopardizing day to day classroom functioning and academic progress

. . . ." (Id. at 142.)

 As part of his evaluation, Plaintiff also underwent an occupational therapy evaluation.

(Id. at 149-51.)  It was noted that "[h]e needed much positive reinforcement" and "was able

to follow verbal directions." (Id. at 149.)  On a test to assess gross and fine motor skills, the

Bruininks-Oseretsky Test of Motor Proficiency, Plaintiff was above average in response

speed (how quickly he could respond to a moving stimulus), below average in visual-motor

control, and average in upper limb speed and dexterity.  (Id.)  In the latter area, "he

complete[d] timed tasks with good speed but decreased accuracy." (Id. at 150.)  His score

on the Developmental Test of Visual-Motor Integration was "very low for his age." (Id.)

His score on the Motor-Free Visual Perception Test – Third Edition was "significantly low

for his age." (Id.)  The examiner concluded that Plaintiff had average fine motor skills, but

"very low" visual-motor and visual perceptual skills.  (Id. at 151.)  She recommended that

he be allowed increased time for written work and that accommodations be considered for

his decreased visual perceptual skills, e.g., not being penalized for penmanship.  (Id.)

 The team concluded that Plaintiff should be allowed increased time for written

assignments; be read to everyday; be instructed in word decoding skills and building a sight

vocabulary; be given opportunities to practice his math skills, for instance, play board games;

be given opportunities to keep a journal; be in a highly-structured classroom seated close to

the teacher and facing the instructional activity; and be given short, one-step directions.  (Id.

at 154-55.)

Acting on the team's recommendations, an Individualized Education Program (IEP) was developed for Plaintiff when he was in the first grade.  (Id. at 158-70.)  His annual goals included writing letters and numbers in a legible manner with 80 percent accuracy; increasing his written expression by writing simple sentences with correct mechanics with 80 percent accuracy; increasing his visual motor skills to be able to cut square shapes with sharp corners and circle shapes with smooth edges on two out of three tries; and independently copying a triangle and diamond shape with 75 percent accuracy on two out of three tries.  (Id. at 161-64.)  Plaintiff was to be in a regular class at least 80 percent of the time.  (Id. at 167.)

A record from the Mehlville School District indicates that, when Plaintiff was in the third grade, he was given lunch detention for fighting.  (Id. at 233.)

Also when Plaintiff was in the third grade, in December 2009, three of his teachers completed a Conners' Teacher Rating Scale – Revised, assessing the frequency of various problems listed, including arguing, short attention span, excitable.[7]  (Id. at 237- 45.)  Two teachers reported no oppositional behaviors, six cognitive problems/inattention behaviors, three hyperactivity behaviors, and thirteen ADHD behaviors.  (Id. at 238, 241.)  The third teacher reported no oppositional behaviors, twelve cognitive problems/inattention behaviors, no hyperactivity behaviors, and fourteen ADHD behaviors.  (Id. at 244.)

---

[7]This rating scale is "used to assess or evaluate attention deficit and hyperactivity disorder in children and adolescents."  **Abreu ex rel. A.M. v. Comm'r of Social Security**, 2012 WL 3927061, *2 n.2 (D. N.J. 2012).

The medical records before the ALJ begin with those of a March 2008 visit to Sandra G. Zakroff, M.D., for a possible medication change for Plaintiff's ADHD.  (Id. at 248.49.) Plaintiff had changed schools, had an IEP in place, and "was doing much better."  (Id. at 248.)  His teachers had noticed that Plaintiff did well on his medication in the morning, but had trouble staying focused after lunch.  (Id.)  The previously-prescribed twenty milligram dosage of Adderall was changed to a prescription for ten milligrams to be taken in the morning and ten in the afternoon.  (Id.)

In June, Plaintiff saw Douglas A. Sakmar, M.D.  (Id. at 252-61.)  His mother reported that Plaintiff had had an unusual body odor for the past two weeks and encopresis (involuntary passage of feces) for the past three days.  (Id. at 252-61.)  Lab tests indicated a normal lead level and borderline anemia, for which a multivitamin was recommended.  (Id. at 258, 260.)  Ms. Scotino was to call if there were any concerns, if Plaintiff was not better, or if the symptoms had not resolved.  (Id. at 253.)  She did not.

Plaintiff again saw Dr. Sakmar in October for a well-child visit.  (Id. at 264-66.)  Ms. Scotino was concerned because Plaintiff's twenty-year old brother had recently been diagnosed with Asperger's Syndrome and Plaintiff had some of the same symptoms, i.e., fine motor delay and being easily angered or scared.  (Id. at 264.)  In terms of his attention problem, Plaintiff was doing "reasonably well" in the morning, but not in the afternoon.  (Id.) On examination, he was healthy.  (Id. at 265.)  His prescription for Adderall was renewed, with ten milligrams to be taken in the morning and fifteen milligrams to be taken at lunch.

(Id. at 264.)  Plaintiff was referred to a neurologist for an evaluation of whether he had Asperger's.  (Id. at 267.)

Plaintiff's prescription for Adderall was routinely reissued in November, January 2009, February, April, May, and August.  (Id. at 269-70, 272-73, 277-88.)  When requesting the first four refills, Ms. Scotino routinely answered "No" to the question whether Plaintiff had any problems with moodiness, appetite changes, or sleep.  (Id. at 269-70, 272-73, 277-80.)  In May, she reported that Plaintiff was "not eating like he should."  (Id. at 281.)  His hunger increased with his activity level.  (Id.)  Also, she was concerned about the effect of Plaintiff changing schools on his medication regimen.  (Id.)  Ms. Scotino again expressed concern about Plaintiff's decreased appetite when requesting a refill of his medication in August.  (Id. at 285.)

Ms. Scotino and Plaintiff did not keep an August 29, 2009, appointment with Dr. Sakmar.  (Id. at 290, 311.)  They did see him the next month.  (Id. at 312-14.)  Plaintiff's symptoms at school were described as "significantly improved."  (Id. at 312.)  His symptoms at home and in social settings were "improved."  (Id.)  He continued to struggle with homework.  (Id.)  Plaintiff's dosage of Adderall extended release was increased to twenty milligrams.  (Id. at 313.)  He was also prescribed melatonin to be taken at bedtime to help him fall asleep faster.  (Id.)

Plaintiff's Adderall prescription was refilled in November.  (Id. at 315-16.)

Later that month, Plaintiff returned to Dr. Sakmar for his annual well-child visit.  (<u>Id.</u> at 319-22.)  Listed as a diagnosis was behavior disorder.[8]  (<u>Id.</u> at 319.)  Elsewhere in the record of that visit the only behavioral problem listed is ADHD.  (<u>Id.</u>)  Ms. Scotino had concerns with Plaintiff's behavior (uncooperative, defiant) and school work.  (<u>Id.</u> at 320.)  She did not have any concerns with his behavior with peers.  (<u>Id.</u>)  On examination, he was active, alert, cooperative, social, and in no distress.  (<u>Id.</u>)  His growth parameters were age-appropriate.  (<u>Id.</u>)  His prescription for Adderall was renewed.  (<u>Id.</u> at 322.)  Plaintiff was to follow-up in one year.  (<u>Id.</u> at 321.)

Plaintiff's prescription for Adderall was refilled in January 2010 and March.  (<u>Id.</u> at 324-27.)  Ms. Scotino's only concern in January was Plaintiff's lack of appetite.  (<u>Id.</u> at 324.)  In March, Ms. Scotino expressed concern that Plaintiff was easily agitated and stayed up too late. (<u>Id.</u> at 326.)

The ALJ also had before him two assessments of Plaintiff functioning abilities completed pursuant to his SSI application.

Plaintiff was evaluated in November 2009 by Alison Burner, M.A., a licensed psychologist.  (<u>Id.</u> at 293-96.)  Ms. Burner noted that Plaintiff was then in third grade and had repeated first grade.  (<u>Id.</u> at 293.)  He had a diagnosis of ADHD, for which he took Adderall.  (<u>Id.</u>)  Because the medication decreased his appetite to the extent that he would

---

[8]Dr. Sakmar lists a code of 312.9 for the behavior disorder.  This is the code for disruptive behavior disorder, not otherwise specified.  <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 103 (4th ed. Text Rev. 2000) (<u>DSM-IV-TR</u>).  "This category is for disorders characterized by conduct or oppositional defiant behaviors that do not meet the criteria for Conduct Disorder or Oppositional Defiant Disorder." <u>Id.</u>

not eat all day, he did not take it when not in school. (Id.) He also had an IQ of 78, indicative of borderline intellectual functioning. (Id.) When Plaintiff does not take his medication, he cannot sit still, has a very short attention span, is impulsive, does not finish what he starts, and avoids chores. (Id. at 294.) He is not defiant or oppositional. (Id.) School records indicated that Plaintiff received support in all academic areas. (Id.) He had significant difficulties in organization and work completion. (Id.) He was distracted. (Id.) Ms. Burner also noted that Plaintiff had seen a psychologist due to his mother's concerns that he has Asperger's Syndrome,[9] and neither the psychologist nor the school personnel diagnosed such. (Id.)

Plaintiff had not taken any medication the day of the exam. (Id.) When Ms. Burner was interviewing Ms. Scotino, Plaintiff could not sit still, constantly interrupted, constantly touched things in the office, and played with Ms. Scotino's hair or glasses. (Id.) When he was interviewed, he was cooperative and had clear speech, normal social language, and appropriate eye contact and affect. (Id.) His thought content was rational and organized. (Id.) His immediate, past, and remote memory were all intact. (Id.) His responses to arithmetic questions were "primarily correct." (Id.) His abstract thinking, insight, and judgment were not within normal limits. (Id.) "His thinking [was] very literal and concrete." (Id. at 295.) Although he was easily redirected during the exam, he could maintain attention

---

[9]Dr. Sakmar's records reflect a telephone call from Dr. Robinson with St. John's Child Developmental Center requesting that documentation that Dr. Sakmar was treating Plaintiff for ADHD be faxed to him. Dr. Robinson was reportedly treating Plaintiff for Autism Spectrum. There are no records from Dr. Robinson in the administrative record.

for only approximately sixty seconds at a time.  (Id.)  He had no difficulties with adaptive functioning.  (Id.)  He could care for his hygiene and do age-appropriate chores.  (Id.)  Ms. Scotino reported that it was difficult to get places on time because of Plaintiff's disorganization and distractability.  (Id.)  He had friends in the neighborhood, but they were primarily younger children.  (Id.)  His school records did not include any concerns with Plaintiff's ability to get along and interact with others.  (Id.)

Ms. Burner concluded that ADHD was an appropriate diagnosis.  (Id.)  With medication and educational support, Plaintiff "should be able to function adequately within society at a level commensurate with his ability."  (Id.)  Without medication, Plaintiff's symptoms were moderate and "significantly negatively affect[ed] his overall functioning, primarily at school."  (Id. at 295-96.)  "Without medication, [Plaintiff's] impulsivity and hyperactivity will likely negatively impact him [sic] social, emotional, educational, and adaptive functioning to a moderate degree and likely would interfere with is [sic] peer relations and education functioning due to inattention, off task behavior, difficulty with task completion, and low frustration tolerance."  (Id. at 296.)  She diagnosed Plaintiff with ADHD, combined type,[10] and borderline intellectual functioning.  (Id.)  "[A]llergies" was

---

[10]ADHD, combined type, "should be used if six (or more) symptoms of inattention and six (or more) symptoms of hyperactivity-impulsivity have persisted for at least 6 months.  Most children and adolescents with the disorder have the Combined Type."  DSM-IV-TR at 87.

also listed as a diagnosis.  (Id.)  She evaluated his Global Assessment of Functioning[11] (GAF) as 60.[12]  (Id.)

A Childhood Disability Evaluation Form (CDEF) was completed by Kyle DeVore, Ph.D., after he received Ms. Burner's report.  (Id. at 297-302.)  Plaintiff's listed impairments were allergies, ADHD, learning disability, and disruptive behavior.  (Id. at 297.)  Dr. DeVore assessed these impairments, singly or in combination, as being severe, but not so severe as to meet or medically equal an impairment of listing-level severity.  (Id.)  Specifically, Plaintiff was found to have less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and caring for himself.  (Id. at 299.)  He had no limitations in the domains of interacting and relating with others, moving about and manipulating objects, and health and physical well-being.  (Id.)  Dr. DeVore noted that there was no medical evidence to support any disabling limitations caused by allergies and that there were "multiple telephone/walk-ins" reflected in the 2009 medical records of Dr. Sakmar, but no other office visits.  (Id. at 301.)

---

[11]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).

[12]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34.

## The ALJ's Decision

After noting that Plaintiff, a school-age child, had clearly not engaged in substantial gainful activity at any relevant time, the ALJ concluded that he had severe impairments of ADHD and borderline intellectual functioning.  (Id. at 13.)  He did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.  (Id.)

After reviewing Ms. Scotino's testimony and Plaintiff's medical and school records, the ALJ addressed his ability to function in the six domains, finding that he had a less than marked limitation in the domains of acquiring and using information, of moving about and manipulating objects, of caring for himself, and of health and physical well being.  (Id. at 14-19.)  Plaintiff had a marked limitation[13] in the domain of attending and completing tasks and no limitations in the domain of interacting and relating with others.  (Id. at 19.)  The ALJ explained his reasoning as to his assessment of Plaintiff's less than marked limitation in the domain of acquiring and using information as follows.

> [Plaintiff] is 10 years old and had to repeat the 1st grade, but he has otherwise progressed from one school year to the next year even without the need for summer school programs.  He has been diagnosed as having [ADHD] and borderline intellectual functioning.  He has qualified for special education services through an IEP.  He gets daily school support and assistance from a special education teacher and gets modified assignments.  A portion of the day, he gets to work outside the regular classroom with more individualized teaching geared for his specific needs.  With this assistance, he is making

---

[13]A child has a "marked" limitation in a domain when his impairment seriously interferes with his ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2).  A marked limitation is "a limitation that is 'more than moderate' but 'less than extreme.'"  Id.

adequate progress and development in his learning and achievements, such that he is not markedly impaired.

(Id.)

Because Plaintiff did not have an impairment or combination thereof that resulted in either marked limitations in two or more domains of functioning or in extreme limitations in one domain, Plaintiff's impairments were not of listing-level severity.  (Id. at 20.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id.)

### Additional Records Before the Appeals Council

After the ALJ rendered his decision, Plaintiff's counsel submitted records from Psych Care Consultants to the Appeals Council.

In June 2011, Plaintiff had a psychosocial evaluation by a practitioner[14] with Psych Care Consultants.  (Id. at 332-34.)  Plaintiff was then eleven years old.  (Id. at 332.)  Ms. Scotino reported that he had "been very impulsive lately."  (Id.)  He had a learning disability, fine motor skills problems, and "problems all around."  (Id.)  He was showing symptoms of oppositional defiant disorder (ODD).  (Id.)  He had been diagnosed in kindergarten with ADHD and was taking Adderall.  (Id.)  On examination, he was well-groomed, cooperative, labile, and expansive.  (Id. at 333.)  His concentration, insight, and judgment were "poor"

---

[14]The signature is illegible.

(Id. at 334.)  He was diagnosed with ODD and ADHD.  (Id.)  His GAF was 65.[15]  (Id.)  Ms. Scotino and Plaintiff did not keep the next two appointments.  (Id. at 331.)

## Legal Standards

Title 42 U.S.C. § 1382c(a)(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for the purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence.  **Neal ex rel. Walker v. Barnhart**, 405 F.3d 685, 688 (8th Cir. 2005); **Brown ex rel. Williams v. Barnhart**, 388 F.3d 1150, 1152 (8th Cir. 2004); **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 646 (8th Cir. 2004).  "'Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's decision.'" **Neal**, 405 F.3d at 688 (quoting Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998)).  It is "more than a scintilla of evidence." **Id.**  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision.  **England v. Astrue**, 490 F.3d 1017, 1019

---

[15]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

- 18 -

(8th Cir. 2007); **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion.  **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th  Cir. 1998).

Under the Act, the ALJ inquires into (1) whether the child is currently engaged in substantial gainful activity; (2) whether the child suffers severe impairments or a combination of severe impairments; and (3) whether the child's impairments meet or equal any listed impairments.  20 C.F.R. § 416.924(a)-(d); **Neal**, 405 F.3d at 688; **Garrett**, 366 F.3d at 647; **Brown**, 388 F.3d at 1151-52.  If the ALJ finds at step two of the evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments (a) cause "marked" limitations in two of six domains and or an "extreme" limitation in one and (b) meet the duration requirement of at least one year. 20 C.F.R. § 416.926a(a); accord **England**, 490 F.3d at 1020.  The six domains are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

## Discussion

Plaintiff argues that the ALJ erred by not finding that he has at least a marked limitation in the domain of acquiring and using information.  Considerations in this domain are of "how well [the claimant] acquire[s] or learn[s] information, and how well [he] use[s] the information [he] ha[s] learned."  20 C.F.R. § 416.926a(g).  "This domain considers more

- 19 -

than just assessments of cognitive ability as measured by intelligence tests, academic instruments, or grades in school." Social Security Ruling 09-3p, 2009 WL 396025, *2 (S.S.A. 2009). For a child of Plaintiff's age at the time of the hearing, the following is considered.

> When [the claimant] [is] old enough to go to elementary and middle school, [he] should be able to learn to read, write, and do math, and discuss history and science. [He] will need to use these skills in academic situations to demonstrate what [he] ha[s] learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. [He] will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). [He] should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [his] own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

Citing selected portions, Plaintiff contends that the observations of his teachers on the Teacher Rating Scale are indicative of at least a marked limitation in the domain of acquiring and using information. This scale is used to assess Plaintiff's ADHD. See note 7, supra. See also **Guthrie v. Astrue**, 2011 WL 7583572, *3 (S.D. Ohio 2011) (finding that teacher's observations on Conners' Rating Scale did not require remand; report was "merely a screening tool" and plaintiff's "cherry pick[ing]" of several observations did not support her position that ALJ had erred when assessing the degree of her limitations in several domains). Three months before the teachers completed the scale, Plaintiff's ADHD symptoms were described as being significantly improved. The month following their assessment, the only

concern Ms. Scotino expressed to Dr. Sakmar was the effect of the Adderall on Plaintiff's appetite.  Additionally, she testified the following summer that Plaintiff had been promoted to the next grade and that his teachers did not require a summer school program, nor did she elect to enroll him in one.  See **Coleman v. Astrue**, 2012 WL 5392256, *4 (E.D. Ark 2012) (finding that ALJ's determination that claimant had less than a marked limitation in the domain of acquiring and using information was supported by promotion to first and second grades after having to repeat kindergarten (Plaintiff had been promoted to second and third grade after having to repeat first grade), by her placement in regular education classes, and by observations of her teacher and her doctor that her behavior had improved).

Plaintiff argues that his need of an IEP and receipt of special education services is indicative of at least a marked limitation in the domain of acquiring and using information. Receipt of special education services does not mandate that degree of limitation.  See 20 C.F.R. § 416.924a(b)(7)(iv) (noting that placement in special education services is not determinative of disability).  Moreover, the ALJ properly considered that the only IEP before him provided that Plaintiff was to spend 80 percent of his time in a regular classroom.  See **England**, 490 F.3d at 1022 (holding that ALJ did not err in finding that claimant had less than marked impairment in the domain of acquiring and using information when, among other things, claimant had progressed through school when "taking at least some general education classes").

Additionally, the records of Dr. Sakmar indicate that Plaintiff improved on Adderall. "An impairment that is controllable does not support a finding of a disability."  **Scales v.**

**Barnhart**, 363 F.3d 699, 705 (8th Cir. 2004).  See **Pepper ex rel. Gardner v. Barnhart**, 342 F.3d 853, 855-56 (8th Cir. 2003) (rejecting argument that claimant had more than a moderate limitation in the domain of acquiring and using information when mother and teacher reported that claimant's behavior and attention improved with medication and behavioral counseling).  See also **N.R.R. ex rel. Davenport v. Astrue**, 2013 WL 1090397, *6 (E.D. Mo. Mar. 15, 2013) (holding in child ADHD case that "[i]t is proper for an ALJ to consider whether a claimant's impairments can be treated with medication when determining whether a claimant has an impairment in a functional equivalence domain").

Plaintiff correctly notes that Social Security Ruling 09-1p provides that "[i]n general, if a child needs a person, medication, treatment, device, or structured, supportive setting to make his functioning possible or to improve the functioning, the child will not be as independent as same-age peers who do not have impairments. Such a child will have a limitation, even if he is functioning well with the help or support." Social Security Ruling 09-1p, 2009 WL 396031, *6 (S.S.A. 2009).  This Ruling does not require that a *marked* limitation be found under the listed circumstances.  Rather, it requires that *a* limitation be found.  The ALJ found a limitation; however, the limitation he found was a less than marked one.  That finding is "within the available zone of choice" and is not to be reversed because there is also evidence to support a different conclusion.  **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011).

**Conclusion**

For the reasons set forth above, the ALJ's decision that Plaintiff did not have at least a marked limitation in the domain of acquiring and using information is supported by substantial evidence on the record as a whole.  Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is AFFIRMED and the case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  19th  day of September, 2013.